IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CR No. 22-CR-01319-WJ |
| | ) | |
| **AMADIUS ARCHULETA**, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States respectfully submits this sentencing memorandum and hereby requests that the Court adopt the presentence investigation report without change and accept the plea agreement. The United States asserts that full consideration of the relevant sentencing factors should lead the Court to the conclusion that an appropriate sentence in this matter is 24 months of imprisonment, 5 years of supervised release, $100 in special penalty assessments, an additional assessment of $5,000, if applicable, under the Justice for Victims of Trafficking Act of 2015, and restitution – if requested by the victim before sentencing is announced – as determined appropriate by the Court. In support, it states as follows:

I. **Factual Background**

On July 2, 2022, then-21-year-old Defendant assaulted Jane Doe, who was then 14-years-old, in an abandoned house within the exterior boundaries of the Taos Pueblo. Both Defendant and Jane Doe are enrolled members of the Taos Pueblo and Indians for purposes of federal law. That night, Jane Doe's father called the police to report Jane Doe was intoxicated and out of control. TPDPS Officers responded to the residence where Jane Doe appeared to be under the influence of drugs and/or alcohol. Jane Doe did not want to speak in front of her parents or the

male officer. Thus, the female officer obtained permission from Jane Doe's parents to speak to her in private. Jane Doe told the female officer that she met a male on Instagram earlier in the day, that they agreed to meet up, and that they walked to an abandoned house near Jane Doe's residence to smoke weed and hang out. Once inside the residence, the male began kissing Jane Doe and then raped her. During that discussion, Jane Doe made suicidal ideations.

The officers then briefed the TPDPS Chief of Police, who had just arrived on scene, about events so far. The Chief entered the residence where Taos County EMS were evaluating Jane Doe and observed that Doe appeared to be under the influence of alcohol and/or drugs, was crying and very upset, and was slurring her words. EMS prepared Jane Doe to be transported to the hospital in the ambulance and took her outside. Jane Doe insisted that the Chief stay with her because Doe appeared to be afraid of the male officers and the male EMT. The Chief explained to her that the Chief would meet her at the hospital and that Jane Doe was safe with the female EMT.

The Chief and a TPDPS Criminal Investigator went to meet Jane Doe at the emergency room. Although a SANE exam was requested due to the allegation, the hospital did not perform an examination due to Jane Doe's level of intoxication. Instead, the examination was conducted later at Solace Crisis Treatment Center, as detailed below.

At the hospital, Jane Doe was distraught and crying and was adamant that she had not consumed alcohol. She admitted she had smoked weed and believed the weed had to be laced with something. While at the hospital, Jane Doe did not want any men near her and she kept saying how disgusting she was and how gross she felt. She was distraught and could barely tell the nurse her name and birthdate. In conversations with the officers and examiners, she was somewhat incoherent and "all over the place," according to law enforcement. However, the Chief also observed that her statements about the assault was entirely consistent throughout. She

described being in an abandoned building where a male had penetrated her vagina after she told him no. She said the male held her arms down and covered her mouth when she tried to scream for help. Jane Doe had a large hickey on her neck and one on her breast. During this period at the hospital, Jane Doe could not recall the male's name, but knew he had long hair and brown eyes. Eventually, she vomited and steadily became more coherent as time passed.

TPDPS officers obtained permission from Jane Doe's parents to look at Jane Doe's Instagram messages on her phone, and Jane Doe voluntarily unlocked the phone for them. One message sent to one of her friends that night said, "if I go missing, I'm with Amadius Archuleta." The next message down was a message thread between Jane Doe and Instagram user "Amadius Archuleta." The messages were from earlier in the evening, between 10:30 and 10:37 PM, and talked about meeting up by the ash pile near the Pueblo – a major geographic landmark south of the historic Plaza. Defendant sent a message to Jane Doe at 10:37 PM saying "I'm here." After that message, Jane Doe sent a message to another friend through SnapChat again saying, "If I go missing, I am with Amadius Archuleta."

Investigators then asked Jane Doe specifically about Defendant. Jane Doe confirmed that was the male's name who she had been with, and he was the one who hurt her. Jane Doe said Defendant had asked to follow her on Instagram earlier that day and they had decided to meet up to smoke weed. When they went into the abandoned house, Defendant started to kiss Jane Doe and then held her down by her arms and covered her mouth. Defendant put his penis in Jane Doe's vagina without a condom and ejaculated inside of her. Jane Doe stated she had told Defendant she had just had a birthday and had turned 14 years old. As she answered questions, Jane Doe became more and more emotional, so investigators ceased questioning for the evening. Before leaving the hospital, police collected Jane Doe's clothing and took photos of hickeys on Doe's neck and breast.

After they left the hospital, TPDPS officers looked up Defendant and found that he was born on July 3, 2000, and was 21 years old at the time of the incident. Officers also determined Defendant's father used to live at the abandoned house where Defendant took Jane Doe and assaulted her. Late that night, TPDPS officers searched the abandoned home and found an almost empty 375 ML bottle of New Amsterdam Pink Lemonade vodka on the floor, near a bunk bed Jane Doe had described. They also found Jane Doe's headphones and lighter, which she had described having.

The next morning, police transported Jane Doe from the hospital to Solace Crisis Treatment Center in Santa Fe for a sexual assault exam. Doe's parents gave verbal permission for the examination. The Solace examiner found vaginal tearing consistent with penetration and Jane Doe's disclosure (specifically: a 0.5cm vertical tear in Jane Doe's fossa navicularis / posterior fourchette at the 6 o'clock orientation). The examination kit materials were later transferred to FBI custody and sent for analysis.

While at Solace, Jane Doe gave a statement that had some additional detail about the assault. At the time of this second statement Jane Doe was sober and coherent. She stated she had met with Defendant and they had walked to the abandoned house to smoke weed and while there, Defendant began to kiss Jane Doe and she told him to stop. Defendant then took off his pants and, while holding Jane Doe down on the bed, took her pants off also. He then penetrated Jane Doe's vagina with his penis and held her arms down. Jane Doe told him to stop and tried to scream for her dogs, but he covered her mouth with his hand. During the assault, she tried not to cry. Defendant ejaculated inside Jane Doe and then got off of her and walked outside. Jane Doe said that by then, she was so scared that she could not move. Defendant then came back inside, got her dressed, and walked Jane Doe home. The examiner asked if she drank any alcohol and

4

Jane Doe repeatedly denied drinking. Rather, she said she had consumed a pink drink and Red Bull.

After the exam, police transported Jane Doe from Solace back to Taos Pueblo. During the drive, police told Jane Doe that Doe's blood alcohol levels had been very high. Doe again denied drinking alcohol and repeated that she had only a pink drink and Red Bull. Investigators later noted that the pink vodka found at the scene of the assault was very sweet and didn't taste like alcohol, and it was possible Jane Doe had not known it was an alcoholic beverage. This would explain why Jane Doe thought she had not been drinking alcohol and that the marijuana was laced with something.

Later in the evening after the SANE exam, police received a call from Jane Doe's father reporting that Jane Doe had taken 25 to 27 sleeping pills and left suicide a note saying, "I took all the sleeping pills my body is somewhere by the river I love you all." Jane Doe walked toward the river and fortunately, was found a short time later by police. While they waited for an ambulance, Jane Doe said she just wanted to die. Before being loaded in the ambulance to go to the hospital, she saw thought she saw Defendant drive by and panicked. She started to hyperventilate and said he was going to get her. Police were not able to confirm that Defendant had driven by.

Investigators later obtained a search warrant to obtain buccal swabs from the Defendant. These were gathered and later analyzed.

On 07/19/2022, Jane Doe was interviewed by a forensic interviewer at the FBI. She shared that Defendant said hi to her on Instragram earlier in the day that the assault happened. He asked her if she wanted to hang out and she said yes. Jane Doe knew who Defendant was because they had friends in common and Defendant's brother, Darius, had followed her on Instagram before. In the Instagram conversation, Defendant asked Jane Doe if she drank and she

5

said yes. During the interview, Jane Doe said that she did not actually drink but said yes to the Defendant anyway. The Defendant said he would go to the store to get a bottle, but Jane Doe told the examiner she didn't intend to drink it. Later, Defendant was dropped off at the Pueblo and they met up. Jane Doe said she could smell alcohol on Defendant from a short distance away.

     Jane Doe said she did not ask Defendant how old he was. She said Defendant and his twin brother look a lot younger than they are and Jane Doe thought Defendant knew her name and how old she was because they have friends in common who are in school with her and are in the same age group. Jane Doe shared that her cousin, B.J., is good friends with Defendant so they also know Jane Doe through him.

     Jane Doe stated when she and Defendant went into the abandoned house, her dogs tried to follow them inside but Defendant would not let them in. Once inside, there were two beds, one large bed, which had broken glass on it, and a bunk bed on another side of the room. Defendant led Jane Doe to the bunk bed. Defendant then gave Jane Doe a fruity drink out of a bottle. It was too dark for Jane Doe to see what it was. At the time, Jane Doe did not think it was alcohol because the drink tasted like juice and Defendant also had a Red Bull that he shared with her.

     They sat and smoked on the bunk for a while. According to Jane Doe, they had the lights off because they did not want to get in trouble for smoking marijuana (Defendant later told investigators that the lights did not work at all, as the house was abandoned. However, it's not apparent whether Jane Doe knew one way or the other. It is possible that Defendant gave her the rationale that they should keep the lights off to avoid getting in trouble and she simply accepted it. It is also possible that the lights simply didn't work.). At some point, Defendant began kissing Jane Doe. She tried to move back away from him but had nowhere to go. There was glass on the bed they were sitting on and Defendant moved her to a bunk bed nearby. He laid her down on the bed and kissed her breast under her clothes. During this period, he gave her two hickeys.

Defendant then tried to pull Jane Doe's pants down, but she told him to stop. He stopped and started kissing her again. Defendant pulled his pants and underwear halfway down and grabbed Jane Doe's hand and put it on his penis, then used her hand to stroke his penis in an up-and-down motion. Defendant then tried again to pull Jane Doe's pants down. Jane Doe tried to say no again but Defendant put his hand over her mouth and told her to shush. Defendant got one of Jane Doe's shoes off and then pulled a pant leg off, then penetrated Jane Doe with his penis. Jane Doe said she felt like it lasted about 30 minutes, that it was her "first time" [having sexual intercourse with a male], and that it hurt. Defendant was moving fast and asked Jane Doe if she wanted him to go slower. Jane Doe was too scared to move or say anything and Defendant's hand was still over her mouth so she could not say anything. The longer he went the faster he went. Defendant said to Jane Doe, "I'm gonna cum in you." Doe again tried to push him off but was not able to. Soon after, he moaned and she felt something inside of her when he was thrusting, then he stopped. When he was finished, Defendant got off Jane Doe, pulled his pants up, told her to get dressed, and he walked outside. Jane Doe tried to get up and felt "really dizzy." It was dark and she looked for her shoe and her phone. When Defendant came back in, he asked her what she was doing and she replied that she was looking for the phone and shoe – at which time she saw Defendant had her phone in his pocket. He handed her the phone and he found her shoe, which he handed to her.

   During the assault, Jane Doe saw Defendant's phone was on the bunk bed near her. At times, she could see the light from the phone was on but did not know why the phone was lighting up. After he was done assaulting Jane Doe, Defendant reached out for the phone and the light turned off on its own or Defendant turned it off himself.

   Defendant walked Jane Doe home and held her hand because she couldn't walk very well and her dogs were tripping her. Not more than 10 minutes after everything happened, they were

7

walking toward her house when Defendant got a call from his brother about being picked up at the Speedway. He quickly walked her to the gate of her house, then pulled Jane Doe's mask down and kissed her before he left. Then he rushed off to be picked up.

Jane Doe went in the house and looked at herself in the mirror and saw the hickeys. She was making noise and her mom came in and saw her, then took Jane Doe to her dad. They were mad at her and asked her if she had been drinking or had taken anything. Jane Doe told them she had smoked but said she had not been drinking alcohol because she didn't think she had.

Jane Doe's sister, C.R., came and took Jane Doe outside. Jane Doe lied to C.R. and told her someone had sprayed her with something when she was outside. C.R. told her mom what Jane Doe said but they didn't believe her. C.R. found out later what had actually happened and told their parents.

Jane Doe's mom then called the police and they came to the house. Jane Doe told the female officer what happened. However, Jane Doe did not remember much of what she said to the officer because she blacked out. She only remembered waking up in the hospital.

Jane Doe did not have any contact with Defendant after the incident, at least in part because her phone was taken as evidence in the investigation. However, C.R. had access to Doe's account online and got into a fight with Defendant from Jane Doe's account because Defendant had been texting Jane Doe about seeing her again.

After Jane Doe went home from having her SANE examination done, people tried to comfort her and told her it wasn't her fault. At home, Jane Doe's mom kept checking on her. Then "the thoughts" of suicide started popping into her head. She wrote notes to family and friends but then trashed them. Then, she wrote a note to her family saying she had taken a lot of pills and was going to the river.

After that, she took the pills and waited about 20 minutes. She waited for her mom to check on her again, then she snuck out of the house when her mom wasn't looking. Jane Doe walked to her best friend A.'s (last name unknown) house because A. was the last person Jane Doe wanted to see. A. was not home and Jane Doe was already dizzy from the pills.

From there, she walked some distance and was discovered by someone in the Pueblo who stopped her. Shortly after, police were contacted, resulting in Jane Doe going to the hospital.

## II. Procedural History

Defendant committed the instant offense on or about July 2, 2022. PSR ¶ 11. Two days later, Defendant was arrested by means of a tribal arrest warrant. *Id*. ¶ 16. On July 21, 2022 a federal arrest warrant was issued via complaint. *Id*. ¶ 18. He was transferred from tribal to federal custody on July 25, 2022. *Id*. at pg. 1. He was released August 1, 2022 with pretrial conditions. *Id*.

On August 9, 2022, Defendant was indicted on one Count of violating 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(A), Aggravated Sexual Abuse. On August 29, 2023, the defendant was returned to custody for violations of his conditions of release. *Id*.

After lengthy plea negotiations, on September 15, 2023, Defendant pleaded guilty instead to a one count Information charging a violation of 18 U.S.C. §§ 1153, 2243(a), and 2246(2)(A), Sexual Abuse of a Minor. PSR pp. 1-2. That plea contained several specific agreements between the parties as to sentencing. Namely, the parties agree that adjustments under USSG § 2A3.2(b)(2); (b)(3); and (c) do not apply in this case, and that a sentence within the guideline range as calculated by the Court, without the above listed adjustments, is the appropriate disposition in this case.

## III. Argument

The United States asserts that the PSR accurately reflects the defendant's guidelines range for the single count of the Information. After calculating Defendant's base offense levels for the count and after applying applicable adjustments and enhancements, his total offense level is 15. PSR ¶ 39. He received a total of a three-level reduction for acceptance of responsibility. PSR ¶¶ 37-38. He has no criminal history resulting in a total criminal history category of I. PSR ¶ 43. Based on the charge at hand, Defendant's statutory maximum term of imprisonment is 15 years. PSR ¶ 69. This differs from the guideline range that would have applied if Mr. Archuleta had been found guilty at trial of the charge in the Indictment, in which case the statutory penalties would be a minimum of 30 years of imprisonment. PSR ¶ 71. If Defendant were convicted at trial of the Indictment, his offense level would have been 40, absent any adjustments. *Id*. An offense level of I combined with a criminal history category of 40 would have resulted in a guidelines imprisonment range of 292 to 365 months. *Id*. This contrasts with the guideline imprisonment range applicable here – after application of acceptance of responsibility for the Charge of the Information – which is 18 months to 24 months. PSR ¶¶ 70-71. As such, the defendant significantly reduced his exposure to incarceration by entering into the plea agreement.

    A.  **Defendant's 11(c)(1)(C) Plea Agreement**

In consideration of acceptance of Defendant's plea agreement, the United States asks this Court to consider the parties' interests in minimizing the uncertainties of trial by negotiating this settlement. "The potential to conserve valuable prosecutorial resources and for defendants to admit their crimes and receive more favorable terms at sentencing means that a plea agreement can benefit both parties." *Missouri v. Frye*, 132 U.S. 1399, 1407 (2012). Parties in a criminal case must assess the likely outcome of motions and trial practice. Defendants in particular must weigh their tolerance for the risk of losing a trial against the benefits of a negotiated settlement.

Likewise, the United States must weigh the public's interests against the risks of proceeding to trial. In consideration of the agreement reached between the parties, the United States carefully weighed the evidence in this case, Defendant's willingness to admit the facts substantiating the single count Information, the considerable resources that going to trial would require for this matter, and the finality that the provisions of this agreement bring to the matter. Of critical importance to the interests of justice, this plea agreement provides certainty and finality to the victim, who occupies a precarious position of vulnerability as a young family member whose discomfort with this case is obvious from her disclosures related in the PSR. *See* PSR ¶¶ 22-27. Accordingly, the United States respectfully requests that this Court accept Defendant's plea agreement.

The terms of the agreement permit considerable leniency in exchange for Defendant taking responsibility for some of the criminal acts alleged. However, the terms also acknowledge and appropriately sanction Defendant for the acts of his crimes. As a result, the United States requests that the Court impose a 24-month sentence in this case.

### B. Application of Sentencing Guidelines and Factors Considered Pursuant to 18 U.S.C. § 3553(a)

The United States Sentencing Guidelines are advisory. See *United States v. Booker*, 543 U.S. 220, 234 (2005). Moreover, a reviewing court may accord a properly calculated sentence to have a presumption of reasonableness for appellate purposes. *Rita v. United States*, 551 U.S. 338, 347 (2007). A district court, on the other hand, cannot presume reasonableness. In determining a sentence, the district court must conduct an analysis using both the Guidelines and the sentencing statutes. Both the sentencing judge and the Sentencing Commission "are carrying out the same basic § 3553(a) objectives, the one, at retail, and the other at wholesale." *Id.* at 345. The Guidelines can be assumed to be a "rough approximation" of a sentence that would "achieve §

3553(a)'s objectives." *Id.* at 347-349. Hence, the district court should impose sentences within the calculated guidelines range when a departure is not appropriate because Guidelines sentences prevent unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) and because the Sentencing Commission policies articulated in the Guidelines are sound and reasoned as a matter of public policy.

1. <u>*Nature and Circumstances of the Offense*</u>

The facts of this case suggest that Defendant knew his target when he began to speak to her over Instagram and they agreed to meet up. And thus, that he knew her age. She agreed to meet with him voluntarily, and also voluntarily entered the abandoned home where this assault took place. But neither her consent to hang out, nor her consent to smoke marijuana there are justification for what came next. The Defendant knew he was having sex with a 14-year-old, because he knew her through friends and family in the community. And he asked about her curfew because he knew her age. He knew what he was doing was wrong.

By Jane Doe's account, Defendant has a modus operandi to prey on young girls. She said they she knew he'd done the same sort of thing with others and additional evidence uncovered in this investigation reveals that he did, indeed, record sexual encounters with other women. It seems that though he tried to do the same here, he largely failed.

Jane Doe's fear of Defendant – and fear of men – is clear. She would not be alone with a male officer after the assault, nor a male EMT in the ambulance. Since then, as her father describes as related in the PSR, she is afraid to be alone in a room with just about any male. She attends counseling as a result of the assault. She has had suicidal ideations and attempts. The reason for criminalizing a disparity in ages among sexual partners as sexual assault is clear in the outcomes observed in this case.

These are severe acts that require a severe sentence. However, there is also reason to concur with the Defendant that certain adjustments in this case do not apply. In particular: USSG § 2A3.2(b)(2); (b)(3); and (c). This is because the United States concurs on the whole that Defendant did not unduly influence the victim to engage in prohibited sexual contact – she entered the home voluntarily and, viewing the evidence in the light most favorable to the defense, some might assess these circumstances to mean that she was a willing participant in the acts. *See* PSR ¶ 17. Likewise, the United States cannot assert that Instagram was used to "persuade, induce, entice, or coerce the victim to engage in prohibited sexual conduct." USSG § 2A3.2(b)(3). Rather, Instagram was used a means to meet up. Criminal suggestions and acts did not occur until later, in person. Finally, after assessing the totality of the evidence and weighing the uncertainty of a jury trial, combined with good faith negotiations with the Defendant, the United States also agreed that a cross reference would not be appropriate in this plea under USSG § 2A3.2(c).

2. *The Need for the Sentence Imposed to Promote Respect for the Law, Provide Just Punishment, Adequate Deterrence, and to Protect the Public from Further Crimes of the Defendant*

The various agreements against upward adjustments in the offense level do not, however, lessen the need for as high as possible a sentence under these guidelines to promote respect for the law, provide just punishment, and more. The outcomes of this case for Jane Doe are plain enough; criminal acts against a child call for a sentence long enough to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). A 24-month sentence will impose specific deterrence on the Defendant, but importantly, also sends a message of general deterrence in the community.

Defendant's guideline range at trial would have been 30 years – or up to 365 months. The benefit of the plea inures substantially to Defendant's benefit here. As such, the United States

cannot recommend anything lower than the top of the applicable guidelines following resolution by Information.

For this young Defendant, who was charged as an adult only by mere months in these acts, a 24-month sentence is adequate but not so long that it may redound negatively. It is the United States' fervent hope that he will emerge rehabilitated, will not again prey on young women, and will live a productive and fruitful life ahead.

IV. **CONCLUSION**

The United States respectfully requests that this Court sentence the Defendant to 24 months of incarceration, five years of supervised release, payment of $100 in special penalty assessments, an additional assessment of $5,000, if applicable, under the Justice for Victims of Trafficking Act of 2015, and restitution – if requested by the victim before sentencing is announced – as determined appropriate by the Court. This recommended sentence is "sufficient, but not greater than necessary to comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a).

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*/s/ Filed Electronically on January 31, 2024*
ALEXANDER F. FLORES
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico 87103
(505) 346-7274
(505) 346-7296 fax

I HEREBY CERTIFY that I filed the foregoing
pleading electronically through the CM/ECF system

which caused counsel of record to be served by electronic means, as reflected on the Notice of Electronic Filing, and other methods of service as indicated therein on January 31st, 2024.

\_\_\_/s/_____
Alexander F. Flores
Assistant U.S. Attorney